| | |
|---|---|
| JOHN F. MURPHY ) | |
| ) | CIVIL ACTION |
| Plaintiff, ) | |
| ) | NO. 4:16-CV-40051-TSH |
| v. ) | |
| ) | |
| COMMONWEALTH OF ) | |
| MASSACHUSETTS – EXECUTIVE ) | |
| OFFICE OF THE TRIAL COURT, HON. ) | |
| PAULA M. CAREY, CHIEF JUSTICE OF ) | |
| THE MASSACHUSETTS TRIAL COURT, ) | |
| HARRY SPENCE, COURT ) | |
| ADMINISTRATOR OF THE ) | |
| MASSACHUSETTS TRIAL COURT, and ) | |
| STEPHEN G. ABRAHAM ) | |
| ) | |
| Defendants. ) | |

# MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS
## (Docket No. 14)

**September 28, 2018**

**HILLMAN, D.J.**

John Murphy (Plaintiff) brought this action asserting various claims against several defendants. Relevant here, against the Commonwealth, Plaintiff asserts claims for discrimination in violation of Mass. Gen. Laws ch. 151B (Counts I and II) and the Americans with Disabilities Act (the "ADA") (Counts III and IV), and tort claims for termination and adverse employment action in violation of public policy (Counts V and VI). Against Stephen Abraham, Plainitff asserts claims for aiding and abetting discrimination in violation of Mass. Gen. Laws ch. 151B (Count VII) and claims for civil rights violations pursuant to 42 U.S.C. § 1983 and Mass. Gen. Laws ch. 12, § 11I (Counts IX and X). Finally, against the Honorable Paula M. Carey and Harry Spence in

1

their official capacities, Plaintiff asserts procedural due process claims and seeks equitable relief in the form of reinstatement by means of 42 U.S.C. § 1983 (Counts XI and XII).

For the reasons that follow, Defendants' motion (Docket No. 14) is **_granted_** in part and **_denied_** in part.

## Background

### 1. Pre-Termination Employment

The following facts come from the Plaintiff's complaint and documents incorporated by reference to his complaint.[1] Factual assertions by the Plaintiff are assumed to be true for the purposes of this motion. Plaintiff was formerly employed as the Family Law Facilitator at the Worcester Probate and Family Court. In early 2011, in his capacity as the Family Law Facilitator, Plaintiff learned that staff was overcharging litigants who were filing cases to modify their child support. Soon after, Plaintiff alerted counter staff to cease charging these fees. When his instructions were not followed, he alerted Judge Denise Meagher. Judge Meagher confirmed that Plaintiff's position was correct and issued a letter instructing the court to cease charging filing fees. Even after this letter, however, counter staff continued to collect unauthorized fees from litigants, often these unlawful payments were made in cash.

On December 7, 2011, the Office of the State Auditor issued an Official Audit Report that found that "the Register of Probate's Office was missing $3,495 in Domestic relations entry fees" over a six month period. Defendant Steven Abraham responded to the report that "the funds in question are not actually missing and that some type of clerical error caused the $3,495

---

[1] Defendants assert and Plaintiff agrees that Defendant Abraham's letter announcing his decision following Plaintiff's pre-termination hearing is incorporated by reference to Plaintiff's complaint. *See Watterson v. Page*, 897 F.2d 1, 3 (1st Cir. 1993) (permitting consideration in a motion to dismiss of "documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.").

2

discrepancy." Plaintiff contends that court staff was in fact stealing fees that were being unlawfully collected, that Defendant Abraham was aware of this practice, and that Plaintiff's voiced opposition was a motivating factor in the subsequent termination of his employment.

In July 2012, Judge Joseph Lian showed the Plaintiff tomato plants growing on the balcony of his courtroom. A co-worker called to the Plaintiff from the street to pose for a photograph before returning inside and the Plaintiff extended his arms to be visible from behind the protecting netting surrounding the balcony. Defendant Abraham summoned the Plaintiff to his office the next day and alleged that Plaintiff's presence on the balcony frightened people and that Defendant Abraham had received complaints that people believed the Plaintiff was attempting suicide. Further, Defendant Abraham contended that Plaintiff's use of the balcony was erratic, dangerous, and reflected poorly on the court. Consequently, Defendant Abraham suspended Plaintiff from his position as a family law mediator indefinitely. The following weekend, Defendant Abraham called the Plaintiff to inform him that he would not be allowed to return to work without a letter from a mental health professional certifying his fitness to return. The psychiatrist whom the Plaintiff was required to see wrote a report stating that the Plaintiff could return to work without restrictions. The report also noted that the Plaintiff was formerly prescribed Ritalin for Attention Deficit Disorder but had not taken it for many years. The doctor did not make did not make new diagnoses, confirm the former diagnosis of Attention Deficit Disorder, or recommend further treatment. The report was provided to Defendant Abraham and never shown to Plaintiff. Defendant Abraham demanded that Plaintiff satisfy two preconditions before returning to work. First, Plaintiff was required to resume taking Ritalin. Second, Plaintiff was required to hire a therapist and take part in psychiatric treatment. Plaintiff agreed to these preconditions on the erroneous assumption that they were being imposed based on the doctor's findings.

Defendant Abrahams subsequently contacted the psychiatrist who examined Plaintiff. In October 2012, the psychiatrist, at Defendant Abraham's behest, issued an addendum to his report recommending the Plaintiff engage in further psychiatric treatment as a condition of continued employment. The addendum contained no reference to medication.

After Plaintiff returned to work, he began to hear rumors that Defendant Abraham told others that Plaintiff was mentally ill, behaving erratically, threatening, and had a problem with alcohol. Further, Defendant Abraham began treating Plaintiff differently upon his return to work. Defendant Abraham began making false accusations against Plaintiff and imposing restrictions on him at work such as requiring him to make daily reports of his activities.

Plaintiff contends that over a period of more than two years, Defendant Abraham exhibited differential treatment towards the Plaintiff in accordance with his perception that the Plaintiff suffered from mental illness. Further, Defendant Abrahams encouraged others to exhibit the same differential treatment. During that time, however, no litigant, co-worker, attorney or judge made any complaints regarding the plaintiff's mental health.

## 2. *Pre-Termination Process*

On May 7, 2013, Defendant Abraham held a hearing to determine whether there was just cause to discharge the Plaintiff. On May 14, 2013, Defendant Abraham issued his findings and notified the Plaintiff in writing that his employment was being terminated for a number of reasons. First, Defendant Abraham alleged that the Plaintiff's behavior was threatening to him and his family and that the Plaintiff was keeping him under surveillance. Second, Defendant Abraham alleged that Plaintiff maligned his reputation to other staff at the court and people in the community. Third, Defendant Abraham alleged that the Plaintiff became excessively involved in cases and gave legal advice to pro se litigants. Fourth, Defendant Abrahams claimed that he was

notified on March 15, 2013 that the Plaintiff smelled of alcohol at work the day before. Fifth, Defendant Abraham claimed that the Plaintiff lied about a dentist appointment on March 14, 2013 so that the Plaintiff could go home to sleep because he was drunk. Finally, Defendant Abrahams alleges that Plaintiff acted inappropriately in connection with a modification of a divorce agreement in November of 2012. Plaintiff rejects all of these reasons as patently false. Following the Plaintiff's termination, five Probate and Family Court Judges wrote a letter to the Trial Court supporting the Plaintiff's reinstatement and his right to a post-termination hearing.

### 3. *Post-Termination Process*

Following his termination, the Plaintiff immediately initiated the grievance process as established by the Collective Bargaining Agreement between the Trial Court and the Plaintiff's union. A hearing was eventually held on or about July 31, 2013 before Massachusetts Trial Court Human Resource Manager, Christine Hegarty. Plaintiff alleges that Ms. Hegarty had been counseled and advised by Defendant Abraham for several months about the Plaintiff's termination and decided to deny the Plaintiff's grievance before the hearing took place, which rendered the hearing a sham. On August 20, 2013, Ms. Hegarty denied the Plaintiff's grievance and upheld his termination.

Following Plaintiff's grievance hearing, he immediately notified the union that he wished to pursue the next step in the grievance procedure, a Demand for Arbitration with the Massachusetts Trial Court. Under the terms of his Collective Bargaining Agreement, only the Plaintiff's Union can initiate this arbitration by filing a demand within twenty workdays after the initial post-termination hearing. The Plaintiff's Union, however, failed to make a timely demand for arbitration. Therefore, his grievance was held to be procedurally inarbitrable.

### **Standard of Review**

Pursuant to Fed. R. Civ. P. 12(b)(1), a defendant may move to dismiss an action for lack of federal subject matter jurisdiction. "The party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Murphy v. United States,* 45 F.3d 520, 522 (1st Cir. 1995). To determine if the burden has been met, a court "take[s] as true all well-pleaded facts in the plaintiffs' complaints, scrutinize[s] them in the light most hospitable to the plaintiffs' theory of liability, and draw[s] all reasonable inferences therefrom in the plaintiffs' favor." *Fothergill v. U.S.,* 566 F.3d 248, 251 (1st Cir.2009).

In addition, a defendant may move to dismiss, based solely on the complaint, for the plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). Although detailed factual allegations are not necessary to survive a motion to dismiss, the standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 13 (1st Cir. 2011).

In evaluating a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 68 (1st Cir. 2000). It is a "context-specific task" to determine "whether a complaint states a plausible claim for relief," one that "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that

the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).  On the other hand, a court may not disregard properly pled factual allegations, "even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556.

**Discussion**

*1. Counts I, II, V, & VI*

Counts I and II assert claims against the Commonwealth under Mass. Gen. Laws ch. 151B, and Counts V and VI assert tort claims against the Commonwealth.  This Court is without subject matter jurisdiction to adjudicate state law claims asserted against the Commonwealth, and therefore these claims must be dismissed.

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Am. XI.  "Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001).

There are two exceptions to Eleventh Amendment sovereign immunity, but neither apply here.  First, Congress may abrogate a state's sovereign immunity through "appropriate legislation." *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011).  "Second, a State may waive its sovereign immunity by consenting to suit." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999).

Congress has clearly not abrogated the Commonwealth's immunity respect to these state law claims.  Further, the Commonwealth has not waived its sovereign immunity either to tort

7

claims or to claims under Mass. Gen. Laws ch. 151B in federal court. *See e.g., Caisse v. DuBois*, 346 F.3d 213, 218 (1st Cir. 2003) ("By enacting the Massachusetts Tort Claims Act, the Commonwealth has not waived its Eleventh Amendment immunity to suit in federal court."); *Adams v. Massachusetts Dep't of Revenue*, 510 F. Supp. 2d 157, 160-61 (D. Mass. 2007) (holding that the Commonwealth had not waived its sovereign immunity with respect to Mass. Gen. Laws ch. 151B).

Plaintiff contends, however, that the Commonwealth has waived its immunity at least with respect to Chapter 151B claims. Plaintiff cites *Adams* for the proposition that past waivers of immunity should constitute a constructive waiver in this case. 510 F. Supp. 2d at 160. In that case, while the court noted that past litigation could arguably amount to a constructive waiver of immunity, it ultimately dismissed the claim because the Commonwealth did not consent to suit "notwithstanding such consent in the past." *Id.* at 160-61. The *Adams* court was persuaded that the "text of Chapter 151B contemplates litigation only in state court" and that the "specific statutory references to the courts of the Commonwealth raise an inference that federal courts were intentionally omitted by the state legislature. *Id.* at 160. *See Lynch v. Massachusetts State Senate,* 495 F. Supp. 2d 175, 179 (D. Mass. 2007) ("M.G.L. ch. 151B does not contain . . . a provision" that "specifically authoriz[es] suit against the state to proceed in federal court."); *Marsolais v. Massachusetts Dept. of Correction,* 2002 WL 373305, *4 (D. Mass. Mar.7, 2002) ("Massachusetts has not waived its sovereign immunity or otherwise consented to suit in federal court arising under [chapter 151B]."); *Fenton v. Univ. of Mass.*, No. CIV.A 10-30007-MAP, 2010 WL 4027737, at *3 (D. Mass. Sept. 10, 2010), *report and recommendation adopted*, No. 10-30007-MAP, 2010 WL

4027735 (D. Mass. Oct. 13, 2010) ("Even though the Commonwealth sometimes waives its sovereign immunity for chapter 151B claims in federal court . . . no such waiver exists here . . . .").[2]

Therefore, I find that the Commonwealth's past litigation of Chapter 151B claims does not constitute a constructive waiver of sovereign immunity. Accordingly, this Court lacks subject matter jurisdiction to adjudicate Counts I, II, V, and VI.

*Counts III & IV*

Counts III and IV assert claims against the Commonwealth under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*. The ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004).

While Plaintiff cites the ADA in his complaint only generally, his claim may be properly brought under Title I. Title I prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Commonwealth, however, has retained its Eleventh Amendment sovereign immunity for suits under Title I. *See Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 n.9 (2001) ("Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I" of the ADA).

---

[2] While neither the Supreme Court nor the First Circuit have addressed this issue, sister circuits have found, in the context of tribal immunity, that past litigation does not constitute a constructive waiver. *See McClendon v. United States*, 885 F.2d 627, 630 (9th Cir. 1989) (holding that a past waiver is "not necessarily broad enough to encompass related matters, even if those matters arise from the same set of underlying facts."); *Jicarilla Apache Tribe v. Hodel*, 821 F.2d 537, 539 (10th Cir. 1987) (holding that earlier litigation regarding oil and gas leases was not "a sufficiently unequivocal expression of waiver in subsequent actions related to the same leases.").

Therefore, this Court does not have subject matter jurisdiction to adjudicate Counts III and IV, insofar as they fall under Title I of the ADA.

Plaintiff contends, however, that his claim may also be properly brought under Title II. Docket No. 17 at 5. Title II provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To support his proposition, Plaintiff notes that the scope of Title II, and whether it can be applied in the employment context, is an open issue in the First Circuit. *See Currie v. Group Ins. Comm'n*, 290 F.3d 1, 6-7 (1st Cir. 2002). Most circuits that have considered the issue, however, have held that employment claims against public entities must be brought under Title I. *See Taylor v. City of Shreveport*, 798 F.3d 276, 282 (5th Cir. 2015) ("Unlike Title I of the ADA, Title II does not create a cause of action for employment discrimination."); *Reyazuddin v. Montgomery Cnty., Md.*, 789 F.3d 407, 421 (4th Cir. 2015) ("Based on the text and structure of Title II and the ADA, we agree with the majority of circuits to have considered the question that Title II unambiguously does not provide a vehicle for public employment discrimination claims."); *Brumfield v. City of Chicago*, 735 F.3d 619, 628 (7th Cir. 2013) ("Title II is clearly inapplicable to employment discrimination because Title I specifically, comprehensively, and exclusively addresses disability discrimination in employment."); *Mary Jo C. v. N.Y. State & Local Ret. Syst.*, 707 F.3d 144, 171 (2d Cir. 2013) (concluding that the ADA "unambiguously limits employment discrimination claims to Title I"); *Elwell v. Oklahoma ex rel. Bd. of Regents of the Univ. of Okla.*, 693 F.3d 1303, 1309 (10th Cir. 2012) ("[E]ach title does important and independent work – work that would be diminished, duplicated, even rendered superfluous were we to read Title II as covering employment discrimination."); *Zimmerman v. Or. Dep't of Justice*, 170 F.3d 1169, 1173

(9th Cir. 1999) ("Congress unambiguously expressed its intent for Title II not to apply to employment."); *see also Menkowitz v. Pottstown Mem'l Med. Ctr.,* 154 F.3d 113, 118-19 (3d Cir. 1998) (discussing Title III and holding that "it is evident that Congress sought to regulate disability discrimination in the area of employment exclusively through Title I"); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014-15 (6th Cir. 1997) (discussing Title III and holding that "the statutory framework of the ADA expressly limits discrimination in employment practices to Title I of the ADA"). *But see Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*, 133 F.3d 816, 822 (11th Cir. 1998) ("[E]mployment coverage is clear from the language and structure of Title II.").

I agree with the majority of the circuits that Title II unambiguously does not cover employment discrimination. Plaintiff notes that the Department of Justice has promulgated a regulation stating that Title II does cover employment practices. 28 C.F. R. § 35.140 (2001). However, because I find that Title II is unambiguous, I do not reach legislative history or regulations. *Dep't of Housing & Urban Dev. v. Rucker,* 535 U.S. 125, 132 (2002) ("[R]eference to legislative history is inappropriate when the text of the statute is unambiguous."); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). Thus, because Plaintiff cannot properly bring his claims under Title II of the ADA, Counts III and IV are dismissed for lack of subject-matter jurisdiction.

### 2. *Count VII*

Count VII asserts a claim against Defendant Abraham for aiding and abetting discrimination in violation of Mass. Gen. Laws ch. 151B. Defendants contend that this claim must be dismissed because the underlying claim against the Commonwealth is dismissed due to

11

sovereign immunity. They cite *Russell v. Cooley Dickinson Hosp, Inc.* for the proposition that because there can be no liability for discrimination in this case, there can be no liability for aiding and abetting discrimination. 437 Mass 443 (2002).

Defendants' proposition, however, does not apply in this case. There may be liability for discrimination here—it simply may not be adjudicated by this court. In *Russell*, the plaintiff could not prove his Mass. Gen. Laws ch. 151B discrimination claims against his employer, and therefore claims brought against an employee for aiding and abetting were dismissed. Here, Plaintiff may still prove the underlying discrimination that the plaintiff in *Russell* could not. Plaintiff then must show that Mr. Abraham "committed a wholly individual and distinct wrong [of aiding and abetting discrimination] . . . separate and distinct from the claim in the main." *Runyon v. Wellington Management Co., LLP*, No. 13-CV-11236-DJC, 2015 WL 1276825, at *7 (D. Mass. Mar. 20, 2015) (quoting *Harmon v. Malden Hosp.*, 19 Mass. Discrimination L. Rep. 157, 158 (1997)).

Thus, while the Commonwealth has sovereign immunity against the underlying discrimination claim, it does not follow that this court may not adjudicate a derivative yet distinct claim against Mr. Abraham.

### 3. Counts IX, & X

Counts IX and X assert claims against Defendant Abraham pursuant to 42 U.S.C. § 1983 and Mass. Gen. Laws ch. 12, § 11I, respectively. Defendant claims that the complaint names Defendant Abraham in his official capacity and notes that both claims are only cognizable against "persons." *See* 42 U.S.C. § 1983; Mass. Gen. Laws ch. 12, §§ 11H, 11I. I find, however, that Mr. Abraham is named in his individual capacity. The complaint does not mention Mr. Abraham's title and notes that he was acting "under color of law." Docket No. 4 ¶ 117. Further, even if there

is ambiguity as to whether Mr. Abraham is named in his official capacity, at this stage in the litigation the ambiguity must be resolved in Plaintiff's favor. *See Langadinos*, 199 F.3d at 68.

### 4. Counts XI & XII

"To state a valid procedure due process claim, a plaintiff must (1) 'identify a protected liberty or property interest,' and (2) 'allege that the defendants . . . deprived [him] of that interest without constitutionally adequate process.'" *Air Sunshine, Inc.*, 663 F.3d at 34 (quoting *Gonzalez-Droz v. Gonzales-Colon*, 660 F.3d 1, 3 (1st Cir. 2011). Plaintiff clearly satisfies the first requirement to assert a due process claim.[3] Therefore, I will examine whether the process afforded to the Plaintiff satisfied the requirements of due process.

#### a. Pre-Termination Process

Because the Plaintiff had a protected property interest in his continued employment, he could not be discharged without due process, including a hearing before his termination. *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 538-42 (1985). While the hearing "need not be elaborate," an employee is "entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546. *See Lopez-Anaya v. Palacios-de-Miranda*, No. CIV. 06-2085CCC, 2007 WL 2254501, at *2 (D.P.R. Aug. 6, 2007) ("The hearing must be more than a mere sham: if plaintiff can prove that the decision makers reached their conclusion prior to the hearing and refused to consider the evidence then due process would not be satisfied."); *Ryan v. Illinois Dept. of Children and Family*

---

[3] Plaintiff had a reasonable and constitutionally protected expectation of continued employment because, under the terms of his Collective Bargaining Agreement, the Plaintiff had a right to continued employment unless just cause existed to justify his termination. *See Wojcik v. Massachusetts State Lottery Com'n*, 300 F.3d 92, 102 (1st Cir. 2013) (recognizing that a collective-bargaining agreement gives rise to a property interest in continued employment under Massachusetts law).

13

*Services*, 185 F.3d 751, 762 (7th Cir. 1999) ("Due process requires that, prior to termination, an employee be given the chance to tell [his] side of the story, and that the agency be willing to listen. Otherwise, the 'opportunity to respond' required by *Loudermill* is not opportunity at all.").

In *Bliss v. Sanguinet*, the plaintiff contended that his pre-termination hearing was a "sham" because the decision to terminate his employment had been made before the hearing, "as evidenced by [the defendant's] prior statements." No. CIV.A. 12-10123-RWZ, 2013 WL 3334728, at *4 (D. Mass. June 24, 2013). Accordingly, the court held that "[w]hether the hearing was indeed a 'sham' is a question of fact not appropriate for resolution at this early stage of the litigation" and that the plaintiff "made sufficient factual allegations that his termination was pre-ordained . . . and thus his hearing was pro forma and meaningless." *Id.* Therefore, the court found Bliss entitled to proceed with his procedural due process claim.

Like the defendant in *Bliss*, whose prior statements evidenced the futility of pre-termination procedures, Defendant Abraham's actions demonstrate that the Plaintiff did not have a sufficiently fair hearing to satisfy due process requirements. Importantly, Defendant Abrahams was the person who held the hearing and, following the hearing, decided to terminate the Plaintiff's employment. Yet, in the years leading up to his pre-termination hearing, Defendant Abraham had promulgated lies about the Plaintiff, forced him to take prescription medications, and exhibited differential treatment based on a perception that the Plaintiff was mentally ill. According to the Plaintiff, this is simply because he had resisted an unlawful scheme to which Defendant Abraham was complicit. If these allegations are true, and at this stage in the litigation we accept them as true, then the inference that the Plaintiff's pre-termination hearing was a sham is almost inescapable. Thus, at this stage in the litigation the Plaintiff has made adequate factual allegations that his termination was pre-ordained and is consequently entitled to proceed with his procedural due process claim.

### b. Post-Termination Process

"[I]f a state provides adequate post-deprivation remedies—either by statute or through the common-law tort remedies available in its courts—no claim of a violation of procedural due process can be brought under § 1983 against the state officials whose random and unauthorized conduct caused the deprivation." *Lowe v. Scott*, 959 F.2d 323, 340 (1st Cir. 1992). This is known as the *Parratt-Hudson* doctrine. *See Parratt v. Taylor*, 451 U.S. 527 (1981); *Hudson v. Palmer*, 468 U.S. 517 (1984). That doctrine, however, does not apply "where the alleged deprivation occurred through the defendants' abuse of the official authority delegated to them by the State." *Bliss v. Sanguinet*, 2013 WL 3334728, at *4. *See Zinermon v. Burch*, 494 U.S. 113, 138 (1990) (doctrine inapposite when "[t]he State delegated to [the state actors] the power and authority to effect the very deprivation complained of . . . and also . . . the concomitant duty to initiate the procedural safeguards.").

Thus, despite the availability of post-termination procedures (without examining whether they sufficed to satisfy the requirements of due process) the Plaintiff was entitled to pre-termination due process. *Cotnoir v. Univ. of Maine Sys.*, 35 F.3d 6, 12-13 (1st Cir. 1994) ("Where an employee is fired in violation of his due process rights, the availability of post-termination grievance procedures will not ordinarily cure the violation. Thus, even where a discharged employee receives a post-termination hearing to review adverse personnel action, the pretermination hearing still needs to be extensive enough to guard against mistaken decisions, and accordingly, the employee is entitled to notice, an explanation of the employer's evidence, and an opportunity to present his side of the story.") (citations omitted). Here, because I find that the Plaintiff was deprived his pre-termination due process rights, it is unnecessary to examine whether post-termination procedures satisfied the constitutional requirements of due process.

## Conclusion

For the reasons set forth above, Defendants' motion to dismiss (Docket No. 14) is ***granted*** in part and ***denied*** in part. Counts I, II, III, IV, V, and VI are dismissed. Counts VII, IX, X, XI, and XII remain.

**SO ORDERED.**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**